COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
101 California St, Fifth Floor
San Francisco, CA 94111
Telephone: (415) 693-2000

MARK F. LAMBERT (197410)
(mlambert@cooley.com)
BRANDON V. STRACENER (314032)
(bstracener@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5200
Facsimile:  (650) 849-7400

*Attorneys for Plaintiff*
MAGIC LEAP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAGIC LEAP, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CHI XU, an individual; HANGZHOU TAIRUO TECHNOLOGY CO., LTD., d/b/a NREAL<br><br>　　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1. BREACH OF CONTRACT**<br>**2. CONSTRUCTIVE FRAUD**<br>**3. UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Magic Leap, Inc. ("Magic Leap" or "Company"), by and through its undersigned counsel, hereby alleges as follows against former Magic Leap employee Chi Xu and the company that he founded and leads, Hangzhou Tairuo Technology Co., Ltd. doing business as Nreal ("Nreal"):

**I.　　SUMMARY OF ACTION**

1.　　Plaintiff Magic Leap is filing this complaint to stop Defendants Chi Xu and Nreal from continuing to exploit Magic Leap's confidential and proprietary

information to unfairly compete in the development of wearable spatial computing glasses and other related technology. By pursuing this litigation, Magic Leap seeks to protect its confidential and proprietary information developed at substantial expense, time and effort, to obtain remedies in equity and law for Chi Xu's material breach of his contractual obligations with Magic Leap, and for unfair competition and other wrongful conduct by Chi Xu and Nreal.

2. Since its founding in 2010, Magic Leap has been an innovator in the emerging field of spatial computing, which encompasses augmented, virtual and hybrid (or mixed) reality technology. It has spent hundreds of millions of dollars in research and development in pursuit of its cutting-edge technology. The technology spans a number of related fields, including precision optics, complicated software, hardware, peripheral componentry, and ergonomic and form-factor design. One of its products is the *Magic Leap One*, an ultralight and ergonomically designed head-mounted virtual retinal display that superimposes 3D computer-generated imagery over real world objects (known as spatial computing, which encompasses augmented, virtual and hybrid (or mixed) reality).

3. As described herein, Defendant Chi Xu ("Mr. Xu") worked at Magic Leap as a software engineer from on or about July 27, 2015, until August 15, 2016. In that capacity, Mr. Xu executed employment-related agreements, including (without limitation) a Proprietary Information and Inventions Agreement ("PIIA") that contained a broad proscription against the improper use or disclosure of any of Magic Leap's confidential and proprietary information during or after his employment. After leaving Magic Leap in August 2016, Mr. Xu spent approximately six months considering his next venture. In or about early 2017, he and others acting in concert with him in the People's Republic of China formed Nreal. According to a video interview of Mr. Xu available at the following link: <https://www.youtube.com/watch?v=rcPB4POYkpc>, he admits that Nreal quickly developed a prototype of lightweight, ergonomically designed, mixed reality glasses for use with smart phones and other devices that are

strikingly similar to confidential Magic Leap designs and confidential and proprietary information to which he had access as an employee. Magic Leap alleges herein that the overall pace of Nreal's development, the overall amount of resources (money and person hours) available to Nreal, and the resulting design, functions, features and components of the Nreal product, indicate that Mr. Xu wrongfully used and disclosed to Nreal and its collaborators the confidential and proprietary information to which he obtained access as a former Magic Leap employee.

## II.  THE PARTIES

4.  Plaintiff Magic Leap, Inc. ("Magic Leap" or "Company") is a Delaware corporation with a principal place of business in Plantation, Florida. Magic Leap was founded, in stealth mode, in 2010. Over the ensuing years, Magic Leap has raised in excess of $1 billion in investment capital. Much of that capital has been used in its extensive research and development efforts in solving the daunting technical challenges posed by spatial computing products, technology and content.

5.  Defendant Chi Xu ("Mr. Xu") is an individual who, on information and belief, is residing in Beijing, China. Mr. Xu formerly worked for Magic Leap in its Sunnyvale, California facilities from July 27, 2015 until August 15, 2016.

6.  Defendant Hangzhou Tairuo Technology Co., Ltd., doing business as Nreal ("Nreal"), is, on information and belief, a business entity conducting business from a location at Unit 6, Unit 1, Building 2, Zhonghang Plaza Number 43, North Third Ring Road, Beijing, Haidian, China. On information and belief, Nreal was founded in or about early 2017.

## III.  JURISDICTION AND VENUE

7.  The Court has federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

8.  Venue is proper in this judicial district because Mr. Xu's contractual obligations and legal duties, and breaches thereof, giving rise to this action occurred

within this judicial district. In addition, a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district. And pursuant to the Proprietary Information and Inventions Agreement ("PIIA"), Mr. Xu expressly consented to personal jurisdiction and venue in this Court for any lawsuit relating to that agreement. Venue thus lies in the U.S. District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b), (c).

## IV.   INTRADISTRICT ASSIGNMENT

9.   Pursuant to this Court's Civil Local Rules 3-5(b) and 3-2(e), this action may be properly assigned to the San Jose Division because a substantial part of the events giving rise to the claims asserted herein occurred in Santa Clara County, California, and plaintiff Magic Leap has a place of business in Santa Clara County.

## V.   FACTUAL ALLEGATIONS

10.   Mr. Xu entered into employment with Magic Leap on or about July 27, 2015. In connection with his employment, Mr. Xu executed various employment agreements, including (without limitation) a Proprietary Information and Inventions Agreement ("PIIA"). A true and correct copy of the executed PIIA is attached hereto as Exhibit A and incorporated herein by reference as though set forth in full.

11.   Section 2 of the PIIA contains a broad prohibition against the unauthorized use or disclosure of the defined confidential and proprietary information both during and after Mr. Xu's employment. It reads, in part:

> I understand that "***Confidential Information***" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, business plans, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my Relationship with the Company), market research, works of original authorship, intellectual property (including, but not limited to, unpublished works and undisclosed

patents), photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment.

12. During his tenure of employment with Magic Leap, Mr. Xu had access to much of Magic Leap's Confidential Information spanning all phases of its research and development efforts, including such areas as software, hardware, product design, form factors and ergonomics, component sourcing and supply chains, vendors, componentry, bills of materials, unreleased products, and marketing.

13. Magic Leap has, since its founding, spent hundreds of millions of dollars in its research and development efforts. In the process, Magic Leap has generated and acquired an extensive body of Confidential Information about many aspects of spatial computing, which encompasses augmented, virtual, hybrid and mixed reality technology, platforms, products, content, and the challenges presented in developing spatial computing devices (which encompasses augmented, virtual and hybrid (or mixed) reality devices).

14. Magic Leap's efforts in that regard have been to design, develop and ultimately commercialize spatial computing systems and products. Thus, the various engineering teams (for example, hardware, software, product design) work extensively with each other in furtherance of the overall Company development objectives. Spatial computing systems and products, in particular, require a complex interplay between software and hardware, form factors, content, and overall system and product design. For this reason, software engineers, specifically including Mr. Xu, had ongoing and frequent access to the other development teams outside of his own department when working at Magic Leap since system integration is one of the main challenges facing spatial computing technology development.

15. In sum, Magic Leap has spent significant time, effort, and expense over many years to generate its Confidential Information. Magic Leap's Confidential Information is not known to or readily ascertainable by the public.

16. Magic Leap is diligent in protecting its highly valuable Confidential Information from falling into unauthorized hands. Magic Leap requires its employees and contractors who have access to Confidential Information to agree to keep confidential and not use the information for anything other than Company purposes. Mr. Xu's PIIA (Exhibit A hereto) is an example of the types of non-disclosure agreements Magic Leap puts in place. Magic Leap instructs and advises its employees about their confidentiality obligations in various manuals, policies and practices. Servers and systems that host Confidential Information are protected by industry standard measures. Access to Confidential Information is restricted to only those who have a reasonable basis to have access to such information. Magic Leap takes appropriate steps to manage employee departures to protect its Confidential Information. Visitors are subject to appropriate security screening and access limitations.

17. During the course of his employment, and specifically during 2015 and 2016, Mr. Xu was aware that Magic Leap had produced multiple conceptual designs for spatial computing products (including, without limitation, glasses and peripherals). These designs represented a range of internal research and development efforts aimed at forming a pipeline of potential products for evaluation of market potential including, without limitation, prototype products and technologies that are not dissimilar (whether in whole or in component part) from the Nreal Light. The designs reflected various iterations and configurations of physical properties, ergonomic and technical feature sets, hardware architecture, software architecture, system architecture, results of trade studies, technology evaluations, aesthetics, device interoperability, supporting and accessory product concepts, and a range of implementations and use cases, all documented and curated under confidential internal code names. These conceptual

designs and plans were confidential and proprietary to Magic Leap (the "Confidential Designs") and revealed Magic Leap's product development plans and innovative work activities. Mr. Xu's access to this information was governed by the terms of the PIIA.

18. During the course of his employment with Magic Leap, on information and belief, Mr. Xu made the decision to leave Magic Leap and move to China for the purpose of establishing with others a company that would compete with Magic Leap in the field of spatial computing and would leverage his knowledge of Magic Leap Confidential Information, including the Confidential Designs. During this time, Mr. Xu neglected his work duties at Magic Leap and participated in internal meetings not directly necessary to his assigned work. On information and belief, Mr. Xu engaged in this conduct to acquire additional Confidential Information, including the Confidential Designs, he could later use for the benefit of the competing company he planned to start and to the detriment of Magic Leap.

19. Mr. Xu ended his employment with Magic Leap on or about August 15, 2016. On information and belief, Mr. Xu returned to China after ending his employment with Magic Leap in the late summer or fall of 2016. On information and belief, Mr. Xu promptly began efforts to obtain funding and support for the business he hoped to start.

20. During this time, Mr. Xu took actions to form Nreal to develop spatial computing products powered by smart phones and other devices (laptops, for instance). On information and belief, Mr. Xu used his knowledge of Magic Leap's Confidential Information, including but not limited to the Confidential Designs, to make production and design decisions at Nreal and to guide the development of spatial computing products intended for sale.

21. By early 2019, Mr. Xu and Nreal had developed prototypes of their first generation product called Nreal Light. Mr. Xu and Nreal demonstrated the product at the January 2019 Consumer Electronics Show ("CES") in Las Vegas. Per Mr. Xu's public statements, Nreal was able to iterate the product seven times in two years, with a small development team (fewer than 20 in number), and facilitated by several rounds

of Chinese venture capital investment, much of it government backed.

22.  The resulting product, as demonstrated at CES and on publicly available videos, bears a striking similarity to the Confidential Designs that Magic Leap had under development before and during the time that Mr. Xu worked at Magic Leap, but which were not ultimately commercialized or publicly released.  Whereas Nreal purported to develop its Nreal Light product in under two years, Magic Leap developed its technology after extensive investment of time (multiple years), money (hundreds of millions of dollars spent on research and development) and human resources (hundreds of engineers).

23.  Mr. Xu derived a comprehensive understanding of all the necessary requirements and solutions that need to go into spatial computing products from his Magic Leap employment.  On information and belief, unlike Magic Leap, Mr. Xu and Nreal avoided the extensive research and development, trial and error, and experimentation that was necessary for Magic Leap to develop its understanding of what worked, and what did not work, in developing spatial computing technology and products.  On information and belief, Mr. Xu's and Nreal's fast development timeline, minimal resources, and design choices reflect their improper use, disclosure and knowledge of Magic Leap's Confidential Information (including the Confidential Designs) protected under the PIAA.

24.  In April 2019, Mr. Xu gave an interview that was recorded on video and is available at the following link: <https://www.youtube.com/watch?v=rcPB4POYkpc>.  In the video, Xu discussed both his time employed at Magic Leap and the creation of Nreal and the Nreal Light spatial computing prototypes.  During the interview, in sum and substance, Mr. Xu acknowledged the aforementioned acquisition of Confidential Information from Magic Leap and his use of that information in the development of the Nreal Light.

25.  Specifically, Mr. Xu acknowledged his initial exposure to the field of spatial computing (which encompasses augmented, virtual, hybrid and mixed reality

technology) came through his employment at Magic Leap.

26. Mr. Xu acknowledged he came to understand the commercial viability of spatial computing (which encompasses augmented, virtual, hybrid and mixed reality technology) in 2015, during the time of his employment at Magic Leap. Mr. Xu stated, "After that, I am a true believer for AR, and I think it is definitely going to take a lot sooner than people expect it for this to take off, so I wanted to be part of that."

27. Mr. Xu further acknowledged that he developed his understanding of the field of spatial computing (which encompasses augmented, virtual, hybrid and mixed reality technology) at Magic Leap. Mr. Xu stated, "I learned a lot from the people, from the whole company, and their vision as well."

28. During the interview, the interviewer expressed astonishment at Mr. Xu's entry onto the scene of spatial computing and development of the Nreal Light and inquired "how could you pull that off" in just over two years in contrast to Magic Leap, which has been working on this technology for a much longer period of time. Mr. Xu responded that this was "a complicated question to answer" while conceding that Magic Leap is a company with "great technology and great people" that is "truly driving the whole industry forward."

29. Mr. Xu then provided his understanding and characterization of the product development strategy Magic Leap has been pursuing during and throughout the time of his employment at Magic Leap and continuing through the present. Mr. Xu acquired this understanding of Magic Leap's business plans and product development strategy through his employment at Magic Leap and his receipt and use of Magic Leap's Confidential Information. Specifically, Mr. Xu asserted his view that Magic Leap is "too ambitious" and "trying just a little bit too hard," and he characterized Magic Leap's product development strategy as follows: "in some way, they are trying to build something that can replace a cell phone in the first generation, which is kind of like mission impossible." Mr. Xu continued with his characterization of Magic Leap's product development strategy, saying "[t]hey are trying to bundle pretty much

everything in the [device] making that bigger and bigger." While Mr. Xu attempted to differentiate the Nreal Lite from Magic Leap's products currently on public sale, in reality, the Nreal Light incorporates and derives from the Confidential Designs and other Magic Leap Confidential Information protected by the PIIA.

30. Mr. Xu's flattery belies his intention to shamelessly copy the business from which he gained intimate knowledge through his confidential relationship. Mr. Xu's goal of appropriating Magic Leap's reputation and image is manifested in his blatant copying of Magic Leap's proprietary font in the Nreal logo:





Mr. Xu's misuse and exploitation of Magic Leap's image and goodwill is further manifested in Nreal's shameless use of whales in its demo experiences, compared to the

whales that Magic Leap has used in its marketing materials, website, and applications since 2014.  *Compare* <https://www.youtube.com/watch?v=LM0T6hLH15k> (Magic Leap), *and* <https://www.youtube.com/watch?v=PyCoTzRzHxo> (Magic Leap), *with* the Nreal demo experience image, retweeted on Nreal's Twitter feed, below:

<https://twitter.com/nreal_MR> (Retweeting @DanaLo's June 5, 2019 Tweet).

Mr. Xu and Nreal are not respectful admirers of Magic Leap, but instead show an intent to free ride on Magic Leap's business, image, and Confidential Information.

31. With the above understanding of Magic Leap's development plans and Confidential Designs, Mr. Xu continued by stating, "So, we are trying to come up with something smaller which would make our job actually easier." Mr. Xu proceeded to discuss the design and functionality sacrifices necessary to produce a smaller device, sacrifices he perceived Magic Leap as unwilling to make in a commercially available product. Notwithstanding the lesser quality and functionality resulting from these design and functionality sacrifices, Mr. Xu explained, "We want to . . . do several things right at the very beginning . . . and then we can add more and more stuff on the list [in subsequent generations of the product]." Mr. Xu stated, "people might be okay with that in the first generation."

32. Mr. Xu further acknowledged that he left Magic Leap with the purpose of developing a competing company and product. Specifically, Mr. Xu said, "Back then, I realized okay we have some advantage in China because if you look at the supply chain, the manufacturing capability, that's something actually um the U.S. or the rest of the world don't have." He stated, "We can iterate so fast" and said, "I wanted to go back to leverage that."

33. Notwithstanding these admissions concerning the timing of his decision to use his knowledge of Magic Leap's Confidential Information (including the Confidential Designs) and pursue the development of a competing business in China, Mr. Xu then advanced a false narrative of the timeline of his evolution from Magic Leap employee to founder and CEO of a competing company based in China producing a product in competition with Magic Leap. On information and belief, Mr. Xu manufactured this false timeline in an effort to conceal the fact that his product development plan and ultimate product design for the Nreal Light was based substantially and fundamentally on Confidential Information obtained during his period of employment at Magic Leap.

34. Specifically, Mr. Xu claimed that after he left Magic Leap, in August 2016, he "took a break" and returned to China, in the middle of 2016, and then spent substantial time engaged in discussions about what to do next, even claiming that it did not occur to him that he was going to be the founder and CEO of his own company, before being encouraged to do so by individuals who became early investors in Nreal. By Mr. Xu's own admission, the company started in early 2017. Belying this supposedly rapid transition, Mr. Xu acknowledged that he had resided in the United States for nine years and did not have a network in China within the entrepreneur community or know how to find investors. Rather, Mr. Xu stated that all of his connections were in the United States. Nonetheless, Mr. Xu claimed he was able to obtain financial backing, perhaps as he claimed because investors were able to "see something in our eyes." In reality, what Mr. Xu was able to offer potential investors was his knowledge and understanding of the Confidential Information (including the Confidential Designs) of Magic Leap, his former employer and principal competitor in the marketplace for spatial computing devices.

## **CLAIMS FOR RELIEF**

## **FIRST CAUSE OF ACTION**
### **(Breach of Contract)**
### **(Against Defendant Xu)**

35. Magic Leap realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 34.

36. The PIIA is a valid and enforceable contract entered into between Magic Leap and Mr. Xu.

37. Magic Leap has performed all promises, covenants and conditions required to be performed on its part under the PIIA.

38. Under the terms of the PIIA, Mr. Xu agreed, among others things, as follows: "I agree at all times during the term of my employment (my '***Relationship with***

*the Company*') and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company or to disclose to any third party without written authorization of the Board of Directors of the Company, any Confidential Information of the Company." (Exhibit A, Section 2(a)) (emphasis in original).

39. Section 2 of the PIIA defines Confidential Information to include: "any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, business plans, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my Relationship with the Company), market research, works of original authorship, intellectual property (including, but not limited to, unpublished works and undisclosed patents), photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment." (*Id.*)

40. Mr. Xu breached the PIIA through his unauthorized use of Magic Leap's Confidential Information in starting Nreal as a business and in creating and promoting Nreal and Nreal Light products.

41. As a result of Mr. Xu's breach, Magic Leap has been injured in an amount to be determined.

42. Magic Leap will suffer irreparable injury as a result of the actions, practices and conduct of Mr. Xu in breach of the PIIA until and unless he is enjoined by the Court.

## SECOND CAUSE OF ACTION

**(Interference with Contract)**

**(Against Defendant Nreal)**

43. Magic Leap realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 42.

44. The PIIA is a valid contract between Magic Leap and Mr. Xu.

45. Nreal, on its own behalf and through its agents, had knowledge of the PIIA and Mr. Xu's obligations to Magic Leap under that contract.

46. Nreal, on its own behalf or through it agents, undertook intentional actions aimed at inducing Mr. Xu to breach the PIIA, or otherwise disrupt Mr. Xu's performance of his obligations under the PIIA.

47. As a result of the conduct of Nreal, including the acts of its agents, Mr. Xu breached the PIIA.

48. As a result of Nreal's actions, including the actions and conduct of its agents acting on Nreal's behalf, Mr. Xu breached his obligations under the PIIA resulting in damage to Magic Leap in an amount to be determined.

49. Pursuant to California Civil Code section 3294, Nrreal's conduct was fraudulent, malicious, and oppressive, and therefore constitutes the basis for punitive damages.

## THIRD CAUSE OF ACTION

**(Constructive Fraud)**

**(Against All Defendants)**

50. Magic Leap realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 49.

51. As a result of the contractual relationship as evidenced by the PIIA, Mr. Xu gained the confidence of Magic Leap, thereby creating a relationship of confidence that extended beyond the time of Mr. Xu's employment by Magic Leap. Nreal knew or should have known of Mr. Xu's relationship of confidence with Magic Leap.

52. Mr. Xu breached that confidence by failing to disclose that he was assisting and enabling his company, Nreal and others, to violate Magic Leap's exclusive rights to its Confidential Information and the technological innovations (disclosed and undisclosed) that Mr. Xu assigned to Magic Leap pursuant to the PIIA.

53. In particular, despite his promises under the PIIA, including his promise to continue to protect the confidences of Magic Leap into the future, Mr. Xu failed to disclose that he (1) intended to and did in fact form and establish a directly competing company founded to develop and exploit Confidential Information, including the Confidential Designs; (2) created a social media presence and brand promoting Nreal; (3) entered into funding agreements with investors for the purpose of funding his new company; and (4) promoted the Nreal Light as a lawfully designed product.

54. Magic Leap relied on Mr. Xu's breach of confidence to its detriment. Had Mr. Xu disclosed his omissions with respect to the formation of his business and the object of his business, Magic Leap would have acted differently. It would have taken faster action to communicate its rights to Mr. Xu, and to communicate its rights to those investing in Mr. Xu's business and actions in violation of Magic Leap's rights.

55. As a result of Mr. Xu's and Nreal's actions, Magic Leap was damaged, and Mr. Xu and Nreal were unjustly enriched by the benefits, proceeds and value obtained through their wrongful acts. In addition to other damages that have not yet been calculated, Magic Leap was denied the benefits of the development and potential public release of its Confidential Designs, among other things.

56. Defendants are jointly and severally liable for the unlawful conduct alleged herein because they aided and abetted each other, or in the alternative, conspired to commit such wrongful conduct.

57. Pursuant to California Civil Code section 3294, Defendants' conduct was fraudulent, malicious, and oppressive, and therefore constitutes the basis for punitive damages.

# FOURTH CAUSE OF ACTION

## (Unfair Competition in Violation of California Business & Professions Code Section 17200, *et seq.*)

**(Against All Defendants)**

58. Magic Leap realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 57.

59. As set forth in Paragraphs 35-57 above, Mr. Xu, assisted by Nreal and others, constructively defrauded Magic Leap by failing to disclose that he had built a business based on false premises, false representations to the public, and unlawful reliance on Magic Leap Confidential Information.

60. The foregoing conduct constituted unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code section 17200, *et seq.*

61. As a result of Defendants' actions, Magic Leap was damaged, and Defendants were unjustly enriched with the proceeds of their wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, Magic Leap prays for judgment against Defendants, and each of them, as follows:

A. For compensatory damages;

B. For disgorgement of any proceeds obtained by wrongful act;

C. For constructive trust;

D. For an accounting;

E. For interest to the extent permitted by law;

F. For an award of exemplary and punitive damages;

G. For injunctive relief; and

H. For such other and further relief as the Court may deem proper.

| | | |
|---|---|---|
| 1 | Dated: June 17, 2019 | COOLEY LLP<br>MICHAEL G. RHODES (116127)<br>MARK F. LAMBERT (197410)<br>BRANDON V. STRACENER (314032) |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | */s/ Michael G. Rhodes* |
| 6 | | Michael G. Rhodes (116127)<br>*Attorneys for Plaintiff*<br>MAGIC LEAP, INC |

## DEMAND FOR JURY TRIAL

Plaintiff Magic Leap hereby demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 17, 2019

COOLEY LLP
MICHAEL G. RHODES (116127)
MARK F. LAMBERT (197410)
BRANDON V. STRACENER (314032)


*/s/ Michael G. Rhodes*
Michael G. Rhodes (116127)

*Attorneys for Plaintiff*
MAGIC LEAP, INC

205854336